## Commonwealth ex rel. Valimont
## v. Bucks County

*Douglas R. Blazey,* Assistant Attorney General, for Commonwealth.

*Peter A. Glascott,* County Solicitor, for defendant.

MOUNTENAY, J., September 17, 1971.—Plaintiff, on behalf of the Township of Nockamixon, seeks, by way of complaint filed pursuant to section 601 of the Clean Streams Law of June 22, 1937, P. L. 1987, as amended, 35 PS §691.601, to enjoin the County of Bucks from operating a certain solid waste disposal facility known as Hidden Valley Landfill (hereinafter called "landfill") in Nockamixon Township and to compel the said county to cease and desist from polluting a water course with leachate emanating from the said landfill. Defendant filed an answer con-

taining certain admissions, whereupon, on motion of plaintiff, judgment was entered against defendant pursuant to the provisions of Pennsylvania Rule of Civil Procedure 1511. Testimony was then taken to assist the court in its adjudication and in framing the decree.

## FINDINGS OF FACT

1. Plaintiff is the Commonwealth of Pennsylvania, its action being brought on the relation of the Solicitor of Nockamixon Township in accordance with the provisions of section 601 of the Clean Streams Law of June 22, 1937, P.L. 1987, as amended, 35 PS §691.601.

2. Defendant is the County of Bucks, a political subdivision of the Commonwealth of Pennsylvania.

3. Defendant is the owner and operator of a certain landfill operation situate in Nockamixon Township, Bucks County, Pa., known and designated as the "Hidden Valley Landfill."

4. Said landfill was acquired by defendant in 1968 from Hans Hyer who had previously operated a disposal facility at the same site.

5. There is, and has been, emanating from said landfill into a watercourse in Nockamixon Township certain seepage, known as leachate. The said leachate is polluting the watercourse, is promoting the growth in abundance of certain organisms therein, and is causing the watercourse to give off a strong and offensive odor to the discomfort and annoyance of certain residents of the said township.

6. The leachate is generated by the decomposition of refuse deposited on the landfill, although a period of from one to two years elapses between the time of deposit and the time of decomposition to a point where leachate is generated. Accordingly, refuse

presently deposited will not contribute to the flow of leachate until from one to two years hence.

7. The discharge of leachate into the watercourses of Nockamixon Township constitutes a public nuisance. No other aspect of the landfill operation constitutes a nuisance.

8. At the time of the filing of the complaint in equity, defendant did not hold a permit for the operation of a solid waste disposal area as required by the Pennsylvania Solid Waste Management Act of July 31, 1968 (No. 241) 35 PS §6001, et seq.

9. Subsequent to the institution of the present action, to wit, on June 4, 1971, the Department of Environmental Resources (hereinafter called "department") issued a solid waste disposal permit to defendant for the operation of the landfill, subject to the following limitations and conditions:

"1). This permit is only for the operation of the solid waste disposal sites designated as A & B on the plan submitted.

"2). The permit holder must apply for and obtain by *July 2, 1971,* an industrial waste permit for the construction and operation of a treatment facility and the discharge resulting therefrom.

"3). The permit holder must submit by July 2, 1971, an additional topographic map of the site containing 5' contour intervals on a scale of 1 to 200' or larger." (Italics supplied)

10. Condition no. 2 of the solid waste disposal permit was not met by July 2, 1971, as therein required, and on July 30, 1971, the undersigned entered an order, effective July 31, 1971, enjoining further operation of the landfill until the issuance of an industrial waste permit for the construction of a treatment facility for the leachate as required by said condition no. 2 and until the approval by the court of a time-

table for the implementation of the plan to collect and treat the leachate.

11. The department did, on August 17, 1971, issue to defendant a "Water Quality Management Permit" authorizing the construction and operation of a plant or facility for the collection and treatment of the leachate in question, this being the "industrial waste permit" mentioned in condition no. 2 of the solid waste disposal permit.

12. Defendant has filed with the court a timetable or construction schedule setting forth the contemplated completion dates of the various phases of construction of the proposed treatment facilities as follows:

| Item | Scheduled Completion Date |
|---|---|
| Construction Plans—Interceptor | September 24, 1971 |
| Plans and Specifications—Site Preparation and Treatment Plant | October 8, 1971 |
| Contract Arrangements | October 15, 1971 |
| Bid Opening | November 10, 1971 |
| Interceptor and Plant Construction | May 1, 1972 |
| Plant Shakedown | June 1, 1972 |

The Department approves the aforesaid schedule as reasonable, and the court finds the same to be reasonable.

13. Plaintiff has exercised its right to request an administrative appeal from the issuance by the department of the water quality management permit, and a hearing on said appeal was scheduled for September 16, 1971.

## DISCUSSION

Section 1 of the Clean Streams Law of June 22, 1937, P. L. 1987, as amended, 35 PS §691.1, defines "pollution" as follows:

" 'Pollution' shall be construed to mean contamination of any waters of the Commonwealth such as will create or is likely to create a nuisance or to render such waters harmful, detrimental or injurious to public health, safety or welfare, or to domestic, municipal, commercial, industrial, agricultural, recreational, or other legitimate beneficial uses, or to livestock, wild animals, birds, fish or other aquatic life, including but not limited to such contamination by alteration of the physical, chemical or biological properties of such waters, or change in temperature, taste, color or odor thereof, or the discharge of any liquid, gaseous, radioactive, solid or other substances into such waters."

Section 401 of the said act, 35 PS §691.401, in turn, makes it unlawful to pollute the waters of the Commonwealth and declares any act of pollution to constitute a nuisance.

There is no question but that defendant's discharge of leachate constitutes a continuing act of pollution, and this is admitted by defendant's answer. On the other hand, it does not appear that any other aspect of the landfill operation (i.e., any aspect apart from the pollution) violates any of the provisions of the Clean Streams Law or, for that matter, constitutes an unreasonable interference with the rights of the citizens of Nockamixon Township. In other words, the Clean Streams Law does not prohibit the proper operation of solid waste disposal facilities (nor even *improper* operation) but simply makes unlawful the pollution of streams. Since the present action was specifically instituted pursuant to the provisions of section 601 of the Clean Streams Law, supra, 35 PS §691.601,* the available remedies must be re-

---

*Section 601 reads, in part, as follows:

"Any activity or condition declared by this act to be a nuisance, shall be abatable in the manner provided by law or equity

stricted to such as will be directed at correcting violations of that particular enactment. Accordingly, the objective of the court's decree should be limited to the elimination of pollution.

It seems obvious from the evidence that enjoining further operation of the landfill will not stop the emanation of leachate. The reason for this, of course, is that the present seepage from the premises is the result of continued refuse disposal over past years, not only during the period of defendant's operation of the facility but also during the period of operation by defendant's predecessor. Indeed, current dumping will not result in the generation of leachate until one or two years hence, while refuse previously dumped will continue to leach contaminants for years to come. Therefore, the solution lies not with the closing down of the facility but rather with the collection and treatment of the leachate.

The department has now approved plans and specifications and has issued a water quality management permit for the construction by defendant of a facility to collect and treat leachate, the issuance of which fulfills condition no. 2 of the solid waste management permit previously issued. Since the department is charged under the provisions of section 6 of the Penn-

for the abatement of public nuisances. In addition, suits to abate such nuisances or suits to restrain or prevent any violation of this act may be instituted in equity or at law in the name of the Commonwealth upon relation of the Attorney General, or upon relation of any district attorney of any county, or upon relation of the solicitor of any municipality affected, after notice has first been served upon the Attorney General of the intention of the district attorney or solicitor to so proceed . . . provided . . . That, except in cases of emergency where, in the opinion of the court, the exigencies of the cases require immediate abatement of said nuisances, the court may, in its decree, fix a reasonable time during which the person or municipality responsible for the nuisances may make provision for the abatement of the same."

sylvania Solid Waste Management Act, supra, 35 PS §6006, with the duties of administering the act, of adopting such rules and procedures as will be necessary to conserve the air, *water* and land resources of the Commonwealth, of protecting the public health, and of preventing public nuisances, we have every confidence that the department, in approving these plans and issuing these permits, has properly fulfilled the aforesaid duties. Indeed, the court is not equipped to make those technical evaluations necessary to determine whether the engineering and design aspects of the proposed plant will adequately collect and treat the leachate. This, as plaintiff concedes, is the function and the statutory duty of the department and falls within its specialized knowledge. The court will not substitute its judgment for the expertise of the department.

Section 601 of the Clean Streams Law, supra, 35 PS §691.601, in providing for the abatement of violations by suits in equity, authorizes the court to permit a reasonable time for such abatement. It is obvious that the collection and treatment system cannot be put into operation overnight. Perhaps defendant should have given consideration to treatment at an earlier date, but bemoaning past errors will not solve present problems. According to the timetable submitted by defendant, a plant for collection and treatment of leachate will be in full operation by June 1, 1972. Such a plant, in the opinion of the department, as evidenced by the issuance of the permits in question, will not only control the pollution which will ultimately be generated by current refuse disposal but will also abate the pollution generated by dumping at the site in years past. Indeed, except by proper collection and treatment of leachate, pollution will continue indefinitely. Accordingly, to allow, and

not only to allow but to direct, that defendant proceed with all diligence to implement the plan for the collection and treatment of leachate in accordance with the permit issued by the Department of Environmental Resources and the timetable submitted to the court, appears to be the only reasonable course to follow. A decree of this nature, the court believes, is authorized by section 601 of the Clean Streams Law, supra, 35 PS §691.601.

It could be argued that the status quo should be maintained and the temporary injunction restraining the operation of the landfill remain in effect at least until such time as there has been a final disposition of plaintiff's administrative appeal from the department's issuance of the water quality management permit. However, we have no way of knowing when a decision will be forthcoming nor whether further appeals will be taken therefrom. Meanwhile, pollution will continue, and construction of a treatment plant will be delayed. Moreover, since the issuance of a water quality management permit constituted a condition to the maintenance of the solid waste disposal permit issued on June 4, 1971, we can reasonably assume that should the "Treatment Permit" be revoked by reason of plaintiff's appeal, the department will withdraw the solid waste disposal permit. Accordingly, the mere pendency of the departmental appeal should not affect our decision.

## CONCLUSIONS OF LAW

1. The discharge of leachate generated by defendant's landfill operation constitutes pollution within the meaning of section 1 of the Clean Streams Law of June 22, 1937, P. L. 1987, as amended, 35 PS §691.1, and, therefore, also constitutes a nuisance and a viola-

tion of the said act pursuant to section 401 thereof, 35 PS §691.401.

2. The remedies available in these proceedings are limited to such as will be directed at correcting violations of the Clean Streams Law, supra.

3. The court, pursuant to the provisions of section 601 of the Clean Streams Law, supra, 35 PS §691.601, may order defendant to proceed with diligence to implement a plan for the collection and treatment of leachate polluting a stream, said plan to be in accordance with a permit issued by the Department of Environmental Resources under section 7 of the Pennsylvania Solid Waste Management Act of July 31, 1968 (No. 241) 35 PS §6007.

## DECREE NISI

And now, September 17, 1971, it is hereby ordered, adjudged and decreed as follows:

1. The order entered on July 30, 1971, restraining further operation by defendant of Hidden Valley Landfill is hereby vacated.

2. Defendant shall proceed with all diligence to take all necessary steps for the construction and operation of a plant or facility for the collection and treatment of all leachate emanating from the Hidden Valley Landfill in accordance with the water quality management permit issued August 17, 1971, by the Department of Environmental Resources of the Commonwealth of Pennsylvania and shall abide by the construction timetable referred to in finding of fact no. 12, said plant to be in full operation by June 1, 1972, and remain in constant operation thereafter as long as pollutants emanate from the said landfill.